MEAD, BAYES & MEAD, Appellant, v. GLEN PALMER, Appellee.

No. 45145.

JUNE 18, 1940.

John D. Randall, for appellant.

Barnes, Chamberlain & Hanzlik, Donald P. Barnes, and E. H. Wadsworth, for appellee.

MITCHELL, J.—This is an action in replevin. Plaintiff alleged that it was the owner of certain ewes and lambs held by the defendant on account of certain contracts whereby 118 ewes and one buck were furnished to the defendant. The

petition further alleged breach of the contracts. That the defendant failed to care for and feed the sheep in a husbandly manner, and sold the wool without the consent of the plaintiff. Defendant admitted the ownership of the ewes in the plaintiff but claimed he was entitled to the possession of the sheep under the contract; that the sheep were properly cared for in a husbandly manner and that the wool was sold after notice to the plaintiff. Defendant then asked damages. There was a trial to a jury, which returned a verdict in favor of the defendant in the amount of $365. Plaintiff has appealed.

Appellant argues that the court erred in not sustaining its motion for a directed verdict made at the close of the evidence, the main grounds of which are that the appellee breached the contracts by selling the wool and by failing to properly feed and care for the sheep in a husbandly manner.

Glen Palmer is a farmer living near Coggon, Iowa. On the 22d day of October, 1937, he entered into a contract, known in the record as Exhibit A, with R. B. Mead and on the 15th day of February, 1938, Palmer entered into a second contract, known in the record as Exhibit B, with R. B. Mead. , These contracts were sold and assigned by Mead to the appellant.

The material parts of Exhibits A and B are as follows:

"Party of the first part agrees to furnish, deliver and lease - - - breeding ewes to the party of the second part. 

"Party of the second part agrees to furnish sufficient feed, pasture and salt for the above said ewes and their lambs for a period of one year, castrate and dock all lambs for a consideration of one undivided half interest of the wool and lamb increase. Party of the first part reserves the right to hold in escrow ½ of the second parties' half of the wool money until termination of this contract.

"Party of the second part also agrees at the expiration of this lease to count back original number of sheep to the first party. Loss to be made up from undivided ewe lambs.

"It is further understood that any time the above ewes are not properly fed and cared for in a husbandly manner,

party of the first part shall have the right to take possession of the above mentioned sheep without cost or expense. Also ewes to be fed grain 30 days before breeding, and 30 days before lambing.

"It is further agreed, party of the first part will furnish bucks, pay all taxes and pay one-half of the shearing expense.

"Party of the second part agrees to deliver all wool and lambs to nearest market. Both parties to this contract agree to be present at time of marketing wool and lambs.

"Party of the second part agrees to pay ½ of cost of drenching all sheep at least twice a year."

The appellee admitted receiving 50 head of ewes by the contract Exhibit A, and 68 ewes and one buck by the contract Exhibit B. These sheep were taken to his farm and kept by him. There is a conflict in the evidence as to whether the sheep were properly cared for. Appellant's witnesses describe them as neglected and not properly fed. While appellee's witnesses tell a story entirely different. What sheep should be fed depends upon their age, and this is due to the manner and time that their teeth appear.

It was exceedingly interesting to the writer of this opinion to read the testimony of the experts in regard to the all important subject of the teeth of the sheep. As sheep cases are quite common and for the enlightenment of the bench and bar, we quote from the abstract:

"A. When a lamb is born they have eight teeth in the lower jaw, what we call full mouth, when the lamb reaches the age of about ten months they begin to lose all of those teeth. By the time it is a year old those teeth have all disappeared and it has no teeth at all. At about the time it loses the last of its baby teeth, we call them, it gets two permanent teeth in the center of the lower jaw. These teeth are quite a lot larger than the baby teeth. And during that time, a period of two months there, the lamb is losing its baby teeth and two center teeth are starting to come through the under jaw, is the general story. They get teeth just like babies. I

will say, their mouths—from that time the two teeth, permanent teeth, start to come in, one on each side. As a two year old the sheep has four in the lower jaw. They don't ever have any teeth in the upper jaw in front. The same thing applies the next year. And when a sheep is four years old it has eight teeth in the lower jaw, which we call the full mouth. And from then on it takes an expert to tell the age of the sheep. I think I can tell the age of teeth up to ten or twelve years. The condition of teeth is quiet apparent on the sheep after they are two years old.''

There is a conflict in the testimony as to whether the sheep were fed the proper foods; whether they were fed a sufficient amount especially at lambing time.

It is also claimed by the appellant that the appellee breached the contract by selling the wool. Appellee testified that he talked on several occasions with the representative of the appellant about selling the wool, and finally told him he was going to sell it. According to his testimony appellant did not object, and later he paid one half of the amount received from the sale of the wool to appellant, who accepted it without objecting. Appellant's witnesses deny this, but clearly the questions of whether the sheep were properly cared for and sale of the wool, were for the jury to decide and the lower court was right in submitting the case to the jury.

Appellant argues that the court erred in giving instruction No. 6, as follows:

''The plaintiff claims the absolute ownership and right of possession of the property described in its petition as amended and set out in instruction No. 1 hereof.

''The defendant denies any ownership of the property in the plaintiff and pleads the right of possession to the property in question, and says that he, the defendant, was in possession of the said items which were wrongfully taken from his possession by the sheriff of Linn County under writ of replevin issued in this cause at the instance of the plaintiff herein, and

that defendant is still the owner of said property and entitled to the immediate possession thereof.''

This instruction told the jury that the defendant denied any ownership of the property in the plaintiff and further stated that the defendant alleged that he was still the owner of the property, and entitled to the immediate possession thereof, whereas in truth and in fact the defendant admitted the ownership of the ewes to be in the plaintiff. No claim was made by Glen Palmer either in the pleadings or in the evidence that he owned the ewes, in fact the written contracts, Exhibits A and B, specifically provided, and that fact was never denied by appellee.

This instruction is therefore erroneous and prejudicial as it allowed the jury to speculate on the ownership of the ewes, which the appellee's pleadings and evidence admitted belonged to appellant. We were not favored with a brief by the appellee.

Many other errors are argued but as this cause must be retried, we do not find it necessary to pass upon same.—Reversed and remanded.

HAMILTON, C. J., and SAGER, HALE, MILLER, STIGER, and RICHARDS, JJ., concur.